1   **EASTMAN MCCARTNEY DALLMANN LLP**
    Andrew S. Dallmann (SBN 206771)
2   Andrew@EMDLLP.com
    2603 Main Street, Suite 200
3   Irvine, California 92614
    Telephone: (949) 379-6649
4   Facsimile: (949) 218-4099

5   **THE GIMINO LAW OFFICE, APC**
    Peter J. Gimino III (SBN 198926)
6   pgimino@giminolaw.com
    1 Park Plaza, Suite 600
7   Irvine, CA 92614
    Telephone: (949) 225-4446
8   Facsimile: (949-225-4447

9   Attorneys for Plaintiff Straumann USA, LLC

10                  **UNITED STATES DISTRICT COURT**

11        **CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

12

13  Straumann USA, LLC, a Delaware          Case No. 8:19-cv-00878
    limited liability company,
14
                    Plaintiffs,             **PLAINTIFFS' MEMORANDUM OF**
15                                          **POINTS AND AUTHORITIES IN**
           v.                               **SUPPORT OF *EX PARTE***
16                                          **APPLICATION FOR TEMPORARY**
    TruAbutment Inc., a California          **RESTRAINING ORDER AND ORDER**
17  corporation,                            **TO SHOW CAUSE WHY A**
                                            **PRELIMINARY INJUNCTION**
18                  Defendants.             **SHOULD NOT ISSUE TO ENJOIN**
                                            **AND RESTRAIN DEFENDANTS**
19                                          **FROM**
                                              1. **INFRINGEMENT OF U.S.**
20                                               **PATENT NO. 8,408,904**
                                              2. **INFRINGEMENT OF US.**
21                                               **PATENT NO. 8,968,002**
                                              3. **FALSE ADVERTISING**
22                                               **(Lanham Act §43)**
                                              4. **UNFAIR BUSINESS**
23                                               **PRACTICES (Cal. Bus. & Prof.**
                                                 **Code §17200, *et seq.*)**
24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ......................................................................................... 1

II.  FACTUAL BACKROUND ........................................................................... 3

   A. Straumann's Patents (The '904 and '002 Patents) ............................................ 4

   B. TruAbutment Knowingly Copies Straumann's Products................................. 6

   C. TruAbutment's Products Are Unsafe and Do Not Have FDA Approval ......... 7

   D. TruAbutment Knowingly Infringes Straumann Holding's Patents................. 10

   E. The Complaint .................................................................................................... 10

III.  ARGUMENT ............................................................................................... 11

   A. Standard for Temporary Restraining Order ..................................................... 11

   B. Straumann Is Likely to Succeed on the Merits of Its Claims.......................... 12

     1.  Straumann is likely to Succeed On The Merits Of Its Patent Infringement
       Claims.......................................................................................................... 12

     2.  Straumann Is Likely To Succeed On The Merits Of Its False Advertising
       Claim ........................................................................................................... 15

     3.  Straumann Is Likely To Succeed On the Merits of Its Unfair Competition
       Claim ........................................................................................................... 17

   C. Straumann Will Be Irreparably Harmed If Defendants Are  Allowed To
     Continue Their Conduct ..................................................................................... 18

   D. The Balance Of Equities Tips In Favor Of Granting Preliminary Injunctive
     Relief To Straumann .......................................................................................... 20

   E. Granting Preliminary Injunctive Relief Is In the Public Interest .................... 21

IV.  CONCLUSION ........................................................................................... 23

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>Cases</u>

*A & L Tech. v. Resound Corp.*,
1995 U.S. Dist. LEXIS 22442, *3 (N.D. Cal. March 15, 1995) ...........................20

*All for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011).........................................................................11, 21

*Apple Inc. v. Samsung Electronics Co.*,
695 F.3d 1370 (Fed. Cir. 2012) ............................................................................19

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
664 F.3d 922 (Fed. Cir. 2012) ..............................................................................19

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
20 Cal. 4th 163 (1999).........................................................................................17

*Commil USA, LLC v. Cisco Sys., Inc.*,
135 S. Ct. 1920, 191 L. Ed. 2d 883 (2015) ..........................................................13

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017)..............................................................11, 12, 20, 21

*Gilder v. PGA Tour, Inc.*,
936 F.2d 417 (9th Cir. 1991) ................................................................................18

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011) .......................................................................................12, 13

*In re Tobacco II Cases*
46 Cal. 4th 298, 207 P.3d 20 (2009) .....................................................................16

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014)................................................................................21

*Lummus Industries, Inc. v. D.M. & E. Corp.*,
862 F.2d 267 (Fed. Cir. 1988) ..............................................................................15

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005) .............................................................................................14

Mississippi Power & Light Co. v. United Gas Pipe Line Co.
760 F2d 618 (5th Cir. 1985).................................................................................19

*Moss v. Infinity Ins. Co.*,
197 F. Supp. 3d 1191 (N.D. Cal. 2016) ................................................................17

*Pom Wonderful LLC v. Hubbard*,
775 F.3d 1118 (9th Cir. 2014)..............................................................................11

*Southland Sod Farms v. Stover Seed Co.*,
108 F.3d 1134 (9th Cir. 1997)..............................................................................15

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
   240 F.3d 832 (9th Cir. 2001)......................................................18

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) .............................................11, 12, 18, 20

*Yamada v. Nobel Biocare Holding AG,*
   825 F.3d 536 (9th Cir. 2016).....................................................22

**Statutes**

35 U.S.C. § 271(c) ...........................................................................14

**Treatises**

*Rutter Group Prac. Guide Fed. Civ. Pro. Before Trial*
   Ch. 13-C, Requirements for Injunctive Relief .......................................19

# I.    INTRODUCTION

Straumann USA, LLC ("Straumann") moves for an order temporarily enjoining TruAbutment Inc. ("TruAbutment"), from continuing to willfully infringe Straumann's patents and from continuing to market and sell a dangerous alternative to Straumann's original dental implant abutments.

TruAbutment sells abutments that it markets as cheap replacements that are "compatible" with Straumann's dental implants.  TruAbutment knows that these products copy Straumann's patented connection.  Moreover, TruAbutment has failed to comply with the FDA's requirements designed to ensure that TruAbutment abutments are safe and effective, and, on information and belief, TruAbutment's products appear to be failing at an unacceptably high rate.  TruAbutment's abutments are therefore not actually compatible with Straumann's implants. TruAbutment's non-compatible abutments' failures present serious safety risks to patients and cause irreparable harm to Straumann.

Straumann spent years and millions of dollars developing and securing FDA approval for its revolutionary ⌀2.9 mm bone level tapered implant.  It is the smallest implant Straumann makes and a gamechanger in the dental industry. Notwithstanding that TruAbutment has sought FDA approval for some of its abutments based on "equivalency" to Straumann abutments, TruAbutment has not sought FDA approval for its ⌀2.9 mm BLT-compatible abutment, which TruAbutment appears to have brought to market almost immediately after the corresponding Straumann's product.  Due to what appears to be its unacceptably high failure rate, this TruAbutment product is exposing dental patients to serious medical risk and is poisoning the market for Straumann's ⌀2.9 mm implants and abutments.

Straumann filed a complaint to seek appropriate relief for TruAbutment's willful patent infringement and unfair competition, and to ensure that patients and doctors continue to have access to safe and reliable dental components.  Straumann

1  will be prepared to address the full merits of its claim in due course and after

2  reasonable discovery.  But in order to preserve the status quo and prevent ongoing

3  harm, Straumann applies to this Court, pursuant to 15 U.S.C. §§ 4 and 25 and

4  Federal Rule of Civil Procedure 65, for a temporary restraining order.

5       The urgency of this motion cannot be overstated in that TruAbutment has

6  already gone to market with its knock-off abutments, including its just released ⌀2.9

7  mm BLT-compatible abutment.  While Straumann does not know when

8  TruAbutment launched any of its specific products, Straumann has only very

9  recently seen TruAbutment products becoming a significant presence in the market.

10  (Cochran Decl. at ¶ 3.)  Straumann has learned in the last few months of two

11  TruAbutment abutments that have failed and required emergency surgery within a

12  single sales region, which is extremely unusual.  (Cochran Decl. at ¶¶ 4-8.)

13       The recent rise to prominence of TruAbutment in this market, combined with

14  the apparently much higher than normal failure rate of this products, present a clear

15  and immediate risk to patients.  When an abutment fails, emergency surgery is can

16  be required to remove entire broken assembly:  often, this means drilling into the

17  maxilla or and mandible to drill out the broken abutment and the implant.  This

18  carries serious risks of permanent loss of bone and damage to nerves.

19       TruAbutment's recent sales of its infringing and purportedly "compatible"

20  products also create irreparable harm to Straumann's reputation.  Because

21  TruAbutment's abutments are small in size and are marketed as a low-cost

22  alternative to authentic components, there is typically no branding on the abutment

23  itself.  As a result, when the inferior, knock-off TruAbutment components are used

24  with a Straumann implant and fail, the failure is inaccurately attributed to

25  Straumann which causes dentists to abandon the use of Straumann products

26  altogether, including, but not limited to, the 2.9 mm implants.

27       Without a temporary restraining order, TruAbutment will be immediately and

28  continuously harming dental patients whose dentists, or the dental laboratories,

MEMO OF P'S AND A'S IN SUPPORT OF TRO     2                    Case No. 8:19-cv-00878

1  improperly substitute TruAbutment's knock-off abutments for an authentic and safe

2  Straumann product.  TruAbutment's actions have damaged and will continue to

3  irreparably damage the market for Straumann's products and harm consumers.

4      Straumann seeks a pause in TruAbutment's sale of its purported Straumann-

5  compatible products to allow Straumann to obtain discovery and to prepare to

6  present the merits of its claims to the Court.  Any time pressures TruAbutment faces

7  as a result of Straumann's intervention at this point are of its own making.

8  TruAbutment has shown its disregard for patient safety by bringing its product to

9  market without proving to the FDA that it is safe and effective, and cannot complain

10  about any damage to a business built on disregard of safety regulations and patent

11  infringement.

12      Therefore, in order to preserve the status quo and prevent ongoing harm,

13  Straumann applies to this Court, pursuant to 15 U.S.C. §§ 4 and 25 and Federal Rule

14  of Civil Procedure 65, for a temporary restraining order enjoining TruAbutment

15  from continuing its sale of infringing and unsafe products and have the matter set for

16  a hearing on a preliminary injunction.

17  **II.    FACTUAL BACKROUND**

18      Straumann is part of the Straumann Group, a global leader in implant,

19  restorative and regenerative dentistry.  In collaboration with leading clinics, research

20  institutes and universities, Straumann conducts research, develops and manufactures

21  dental implants, instruments, prosthetics, tissue and bone regeneration biomaterials

22  for use in tooth replacement and restoration, or to prevent tooth loss.

23      Straumann is the leading provider in the United States of premium dental

24  implants.  More than three million people in the United States have one or more

25  dental implants.  Dental implants are implantable medical devices that are surgically

26  implanted in a patient's maxilla or mandible (upper or lower jaw bone) to replace

27  natural teeth, and function as artificial tooth roots.  After being placed in a patient's

28  maxilla or mandible, those implants are integrated into the patient's natural bone

(referred to in the field as "osseointegration").  Dental implants may be designed so that the top is level with the surrounding bone (a "bone-level" implant) or so that the top extends past the bone into the surrounding gum tissue (a "tissue-level" implant).

A connector – known as an abutment – is then placed on inside of the dental implant.  Placing the abutment is usually done only after the patient has had time to heal from the implant surgery, and enough time has passed to allow osseointegration.  This abutment may be secured to the implant with a small screw. An abutment holds and supports a dental restoration, such as a crown or bridge.

### A.     Straumann's Patents (The '904 and '002 Patents)

Straumann has patented several aspects of its dental implant systems.  In particular, Straumann has obtained patents on the innovative CrossFit t® connection between its bone-level implants and their corresponding abutments.

The patents-in-suit are US Patent Nos. 8,968,002 (the "'002 Patent") and 8,408,904 (the "'904 Patent"), both titled "Coupling for a Multi-Part Dental Implant System."  The '904 Patent was duly and legally issued by the United States Patent and Trademark Office on April 2, 2015.  The '002 Patent was duly and legally issued by the United States Patent and Trademark Office on March 3, 2015.

Plaintiff Straumann is the exclusive licensee of the Patents-in-Suit with all substantial rights to those patents.

Doctors and patients demand confidence in the stability of the implant/abutment connection.  (Vogel Decl. at ¶ 4.)  As the patents-in-suit explain, before the CrossFit connection, "a frequent problem arising" with conventional implants "is the correct positioning of the abutment or the secondary part within the dental implant already placed in the bone tissue."  (Dallmann Decl. at ¶¶ 3-4 (Ex. A at 1:17-20; Ex. B at 1:32-35)  The patented CrossFit connection solves this problem by "avoid[ing] the drawbacks of the prior art devices, and thus allowing a stable and sterile coupling between the dental implant and the abutment."  (Dallmann Decl. at ¶¶ 3-4 (Ex. A at 2:2-4; Ex. B at 2:18-20).

A picture of a Straumann bone-level implant, abutment, and screw is shown in cross-section below, as is a drawing of the same assembly from one of the patents-in-suit.



One advantage of the patented inventions is the innovative anti-rotational features in the implant and abutment.  It is important that an abutment be stable and unable to rotate when it is fixed within an abutment.  One of the innovative aspects of the patented CrossFit connection is the addition of anti-rotational elements in the abutment and implant:  these elements mate precisely with each other when the abutment is correctly aligned and inserted, sealing the abutment and preventing rotational movement.  These anti-rotational elements in abutments and implants are shown in the figures below, which are images of a Straumann CrossFit implant/abutment connection and figure 6 of the '904 Patent.



Another advantage of the patented CrossFit connection is the anti-jamming feature.  The patent claims a system in which the abutment cannot be fully inserted into the implant unless these anti-rotational features are aligned.  (Dallmann Decl. at ¶¶ 3-4 (Claim 1)).  The screw cannot grip the threads of the implant if the abutment is not fully inserted.  This feature therefore prevents a doctor from securing the assembly without proper alignment.  As shown in Figure 1E (below) and as explained in the patents-in-suit:  the fastening (or threading) of the screw 3 to a dental implant is only possible once the second section 4 along with the third section 22 are fully inserted into their complementary sections of the dental implant, as will be described hereinafter.  In this way a wedging of the screw can be avoided. (Dallmann Decl. at ¶ 3 ('904 Patent, 4:64-5:2.))



**B.    TruAbutment Knowingly Copies Straumann's Products**

TruAbutment sells abutments that they market as "compatible" with other manufacturers' implants, including Straumann's.  An exemplary screenshot from TruAbutment's website promoting their DS line of abutments' compatibility with Straumann's bone- and tissue-level implants is set forth below (Dallmann Decl. ¶ 5; Ex. C):



TruAbutment knows that it is copying, with its SBN and SBR line of products (the "Accused Products") existing Straumann products. For example, in its regulatory filings TruAbutment lists Straumann's products (see below) as "predicate devices" and explicitly notes that its products copy the CrossFit connection. (Dallmann Decl. at ¶ 6; Ex. D at Page 3 of 7).

TruAbutment goes on to note in its regulatory filings that "TruAbutment DS incorporates the same material, indicates for use, dimension, design, abutment seat, screw seat, anatomical site, connection, type of retention, and technological characteristics of the predicate device [including the Straumann predicate devices]." (Dallmann Decl. at ¶ 6; Ex. D at Page 6 of 7).

**C.    TruAbutment's Products Are Unsafe and Do Not Have FDA Approval**

TruAbutment does not appear to have obtained 510k clearance for most of its infringing products. Even for this one filing – for its DS line of abutments – it is important to note that the three abutment widths listed above are for use with three different sized Straumann implants, namely, bone level implants having widths of

3.3 millimeters (mm), 4.1 mm and 4.8 mm.  Even assuming, *arguendo*, that these three TruAbutment abutments are "equivalent" to authentic Straumann abutments, TruAbutment has done nothing to establish that the same is true of TruAbutment's abutment compatible with Straumann's 2.9 mm implant.  Indeed, TruAbutment did not even attempt to seek FDA approval for this abutment (a criminal violation). (Jackson Decl. at ¶ 9.)  Instead, TruAbutment went straight to market in an improper and illegal attempt to compete with Straumann.  TruAbutment's 2.9 mm abutment is dangerous and exposes dental patients to serious and unnecessary risk.

Poorly made third-party abutments present serious safety risks to patients. When an abutment is poorly made – because it is not manufactured to the exact specifications of the original product, and/or because it is made of inferior materials – there is an increased chance that some combination of the implant, abutment, or screw will break.  (Vogel Decl., ¶¶4-6).  Even relatively small imperfections can eventually lead to breakage, because the patient's chewing force creates extreme strain on an implant and abutment.  (*Id*. at ¶5.)  When one of these components break, doctors are forced to emergency surgery to remove the failed component. (*Id*. at ¶10-12.)  The most common approach for implant removal has been trephination, which involves using a drill bit wider than the implant and removing the whole assembly (while trying to avoid removing or damaging as much other surrounding and bone as possible).  Trephination carries serious risks of permanent damage to the patient's bone, tissue, nerves, and other oral structures.  (*Id*. at ¶12.)

Another option for removing a broken dental implant involves trying to place a new screw inside the implant with a reversed thread, and then removing the implant and screw together under considerable force.  While this can minimize damage to surrounding tissue, this procedure involves substantial torque, which can cause the screw to break, requiring another, more invasive approach.  (*Id*. at ¶13.) Additional approaches to implant removal involving using thermal explantation and

1   application of piezoelectric charge have been proposed, but have not been widely
2   adopted.  (*Id*. at ¶14.)

3          Abutments for use in dental implants are classified as a Class II medical
4   device by the FDA (Code of Federal Regulations 21 872.3630).  (Jackson Decl. at
5   ¶4.)  That means that these are considered "medium to moderate risk devices" by the
6   FDA.  (*Id*.)  *See Comm. of Dental Amalgam Mfrs. & Distributors v. Stratton*, 92
7   F.3d 807, 809 (9th Cir. 1996)(" Medical devices which involve some risk of injury
8   are classified as Class II devices and are subject to "special controls," including
9   performance standards, use guidelines, and post-market surveillance programs.").

10         Section 510(k) of the Food, Drug and Cosmetic Act requires those device
11  manufacturers who must register to notify FDA their intent to market a medical
12  device.  (Jackson Decl. at ¶5.)  This is known as Premarket Notification (PMN) or
13  510(k).  (*Id*.)  Before a manufacturer can market a medical device in the United
14  States, they must demonstrate to FDA's satisfaction that it is substantially equivalent
15  (meaning, as safe and effective) to a device already on the market.  (*Id*.)

16         Before marketing or selling a dental implant or abutment in the United States,
17  the manufacturer is required to seek 510(k) clearance.  (*Id*. at ¶¶5-6.)  The FDA
18  considers selling a product without a 510(k) clearance to be the same as selling an
19  adulterated product.  (*Id*. at ¶6.)  It is a federal crime to knowingly sell a product that
20  requires a 510(k) clearance without obtaining that clearance.  21 U.S. Code § 333.
21  (*Id*. at ¶8.)

22         The FDA displays limited information to the public about the 510(k) filings
23  made by medical device companies.  (*Id*. at ¶9.)  From the information available on
24  this website, it appears that TruAbutment has failed to follow this process for most
25  of the abutments it markets in the United States.  (*Id*. at ¶10.)  A list of
26  TruAbutment's advertised products that indicates the products for which 510(k)
27  clearances were not obtained is attached as Exhibit A to the Declaration of Jennifer
28  Jackson, attached hereto.  (Jackson Decl. at ¶12.)  To summarize that list,

TruAbutment does not appear to have obtained 510(k) clearances for dozens of Straumann-compatible products it sells in the US.

Straumann has notified the FDA of this apparent failure to comply with the FDA's regulations.  (*Id.* at ¶12, Ex. B.)

### D.    TruAbutment Knowingly Infringes Straumann Holding's Patents

Straumann's products are covered by the patents-in-suit.  Accordingly, by copying Straumann's abutments and locking screws for use with a Straumann implants, TruAbutment has knowingly committed patent infringement.  The claim charts attached herewith establish that TruAbutment infringes at least Claim 1 of the two patents-in-suit.  (Dallmann Decl. at ¶¶ 7-8; Ex. E-F.)

TruAbutment also knows and has known that the CrossFit connection is covered by the asserted patents.  In 2015, a Straumann salesperson saw a TruAbutment booth at an industry trade show.  (Thom Decl., at ¶¶3-4.)  He noticed that the TruAbutment booth was advertising CrossFit-compatible abutments, and asked how they could sell these abutments without a patent license from Straumann.  (*Id.* at ¶¶4-5.)  Without responding to his question, the TruAbutment representative put the Straumann-compatible abutments in his pocket and refused to answer any other questions.  (Id. at ¶¶6-7.)

Finally, TruAbutment has had actual notice of its infringement of the patents-in-suit since at least May 9, 2019, when Straumann sent a cease and desist letter to TruAbutment.  (Dallmann Decl. at ¶ 9; Ex. G.)

### E.    The Complaint

Based on the discovery of TruAbutment's infringing products, Straumann filed a Complaint for damages and application for permanent injunction against TruAbutment alleging four counts for:  (1) Infringement of U.S. Patent No. 8,408,904; (2) Infringement of U.S. Patent No. 8,968,002; (3) False Advertising (Lanham Act §43(a)); (4) Unfair Business Practices (Cal. Bus. & Prof. Code § 17200, *et seq.*).

III.   **ARGUMENT**

   A.   **Standard for Temporary Restraining Order**

   "A preliminary injunction is an extraordinary remedy never awarded as of right.  [Citation]  In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'  [Citation]  'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'"  *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008) (citations omitted).

   "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter,* 555 U.S. 7 at 20.  *See, Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (citing the four elements for preliminary injunctive relief set forth in *Winter*).

   "A preliminary injunction may also be appropriate if a movant raises 'serious questions going to the merits' and the 'balance of hardships ... tips sharply towards' it, as long as the second and third *Winter* factors are satisfied."  *Disney Enterprises, Inc. v. VidAngel, Inc.,* 869 F.3d 848, 856 (9th Cir. 2017) (citation omitted).  *See also, All for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011) (recognizing that "serious questions going to the merits" and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.")

   As shown below, Straumann is able to establish each of the required elements in support of preliminary injunctive relief.

**B.      Straumann Is Likely to Succeed on the Merits of Its Claims**

Establishing a likelihood of success on the merits has been regarded as the "most important *Winter* factor." *Disney Enterprises, Inc. v. VidAngel, Inc.,* 869 F.3d 848, 856 (9th Cir. 2017).  Further, "once the moving party has carried its burden of showing a likelihood of success on the merits, the burden shifts to the non-moving party to show a likelihood that its affirmative defense will succeed." *Id.* (citations omitted).

**1.      Straumann is likely to Succeed On The Merits Of Its Patent Infringement Claims**

**a)      TruAbutment Has Directly Infringed The '904 and '002 Patents.**

"Direct infringement has long been understood to require no more than the unauthorized use of a patented invention." *Glob.-Tech Appliances, Inc. v. SEB S.A.,* 563 U.S. 754, 761, n.2 (2011).  As a result, "a direct infringer's knowledge or intent is irrelevant." *Id.*

Here, comparing Straumann's '904 Patent to an exemplary Accused Product from TruAbutment reveals that the Accused Product (consisting of an abutment and locking screw) is a copy of Straumann's design and practices one or more of the claims of the '904 Patent.  Specifically, TruAbutment directly infringes the '904 Patent, including claim 1, by making and using the Accused Products in conjunction with the Straumann CrossFit line of implants.  (Dallmann Decl. at ¶ 7; Ex. E.)  At no time has Straumann granted TruAbutment authorization, license, or permission to practice the inventions claimed in the '904 Patent.

Similarly, comparing Straumann's '002 Patent to an exemplary Accused Product from TruAbutment reveals that the Accused Product is a copy of Straumann's design and practices one or more of the claims of the '002 Patent. Specifically, TruAbutment directly infringes the '002 Patent, including claim 1, by making and using the Accused Products in conjunction with the Straumann CrossFit

1   line of implants.  (Dallmann Decl. at ¶ 8; Ex. F.)  Further, at no time has Straumann

2   granted TruAbutment authorization, license, or permission to practice the inventions

3   claimed in the '002 Patent.  Moreover, TruAbutment's infringement as to both

4   patents-in-suit is willful.

5        In 2015, a Straumann salesperson saw a TruAbutment booth at an industry

6   trade show.  (Thom Decl., at ¶2-5.) He noticed that the TruAbutment booth was

7   advertising CrossFit-compatible abutments, and asked how they could sell these

8   abutments without a patent license from Straumann.  (*Id*. ¶6.)  Without responding

9   to his question, the TruAbutment representative put the Straumann-compatible

10  abutments in his pocket and refused to answer any other questions.  (*Id*. ¶7.)

11       And TruAbutment has had actual notice of its infringement of the patents-in-

12  suit since at least May 9, 2019, when Straumann sent and cease and desist letter to

13  TruAbutment.  (Dallmann Decl., ¶ 9, Ex. G.)  Notwithstanding that it is on notice of

14  its infringement, TruAbutment continues to engage in acts of infringement.

15                    **b)     TruAbutment Has Induced the Infringement of The**

16                         **'904 and '802 Patents.**

17       Whoever actively induces infringement of a patent shall be liable as an

18  infringer.  35 U.S.C. § 271(b).  Induced infringement has three elements:  (1)

19  knowledge of the patent, (2) knowledge that the induced acts will infringe, and (3)

20  intent to bring about the infringement.  *Commil USA, LLC v. Cisco Sys., Inc.,* 135 S.

21  Ct. 1920, 1925, 1928, 191 L. Ed. 2d 883 (2015).  "Inducement must involve the

22  taking of affirmative steps to bring about the desired result." *Global-Tech*

23  *Appliances, Inc. v. SEB S.A.,* 563 U.S. 754 (2011).

24       Further, the Courts have recognized that inducement of infringement may be

25  based on active steps to encourage infringement:

26       Evidence of "active steps ... taken to encourage direct infringement,"
       [Citation], such as advertising an infringing use or instructing how to
27     engage in an infringing use, show an affirmative intent that the
28     product be used to infringe, and a showing that infringement was

> encouraged overcomes the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use . . . .

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 936 (2005)(citation omitted).

Here, TruAbutment indirectly infringes the '904 Patent by instructing, directing, and/or encouraging others, including its customers, purchasers and users, to purchase and use the Accused Products, which have no substantial non-infringing use, and which practice the inventions claimed in the '904 Patent, when combined with the Straumann CrossFit line of implants.  TruAbutment's abutment and locking screw have no other application other than to be used with a Straumann implant. Thus, TruAbutment knew that it was inducing others, including customers, purchasers, dental laboratories and dentists, to infringe, by practicing, either themselves or in conjunction with TruAbutment, one or more claims of the '904 Patent, including Claim 1.

Similarly, TruAbutment indirectly infringes the '002 Patent, by instructing, directing, and/or encouraging others, including its customers, purchasers and users, to purchase and use the Accused Products, which practice the inventions claimed in the '002 Patent, when combined with the Straumann CrossFit line of implants.

### c)     TruAbutment Has Committed Contributory Infringement of the '904 and '802 Patents.

In defining contributory infringement, Congress has declared that:

> Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, shall be liable as a contributory infringer.

35 U.S.C. § 271(c).

The key elements of contributory infringement under Section 271(c) are: (1) knowledge that an article is being used as a material element in an infringing product and (2) a showing that the article being used is not a staple item of commerce with no substantial noninfringing uses.  *See, Lummus Industries, Inc. v. D.M. & E. Corp.*, 862 F.2d 267, 272 (Fed. Cir. 1988) (stating that contributory infringement requires a showing of knowledge of infringing use and that the article is not suitable for substantial noninfringing use).

Here, TruAbutment has contributed and continues to contribute to infringement of at least Claims 1 of the '904 Patent under 35 U.S.C. § 271(c) by making and selling the Accused Products, which have no substantial non-infringing use, indeed has no other use other than to be combined with the Straumann CrossFit line of implants, and which practice the inventions claimed in the '904 Patent.

Similarly, TruAbutment has contributed and continues to contribute to infringement of at least Claims 1 of the '002 Patent under 35 U.S.C. § 271(c) by making and selling the Accused Products, when combined with the Straumann CrossFit line of implants.

## 2.    Straumann Is Likely To Succeed On The Merits Of Its False Advertising Claim

"The elements of a Lanham Act § 43(a) false advertising claim are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).  *See also, In re Tobacco II Cases*, 46 Cal. 4th 298, 312, 207 P.3d 20, 29 (2009) ("[T]o state a claim

1   under either the UCL or the false advertising law, based on false advertising or

2   promotional practices, 'it is necessary only to show that "members of the public are

3   likely to be 'deceived.'")

4        Here, TruAbutment sells abutments that they market as "compatible" with

5   other manufacturers' implants, including Straumann's.  TruAbutment's website[1]

6   advertises several groups of products (listed below) which include abutments

7   advertised as compatible with Straumann implants, including bone-level implants

8   using Straumann's patented CrossFit connection, as well as Straumann's tissue-level

9   implants and Neodent implants:

10         • "DS" custom abutments,

11         • "angulated screw channel" line,

12         • An "All-on-T" line of multi-unit abutments,

13         • "T:Loc" overdenture abutments, and

14         • "Tru Base" and Cerec® Ti-Base titanium abutments.

15   (Jackson Decl., Ex. A).

16        The advertisement that TruAbutment's products are compatible with or

17   equivalent to Straumann's authentic products are false as evidenced by the failure

18   rate experienced with the TruAbutment products.  (Cochran Decl., ¶¶ 4-9.)

19   Consumers of TruAbutment's products (i.e., dental laboratories and dentists) have

20   no meaningful way of discerning the quality or compatibility of TruAbutment's

21   components for use with Straumann implants by visual inspection.  As a result, the

22   advertisement that the products are compatible constitutes a material inducement to

23   purchase those products.  TruAbutment's advertising is specifically designed to

24

25

26   [1] https://truabutment.com/pages/tru-abutment-ds; https://truabutment.com/pages/angulated-screw-

27   channel; https://truabutment.com/pages/all-on-t; https://truabutment.com/pages/t-loc;
    https://truabutment.com/pages/tru-scan-body; https://truabutment.com/pages/ti-base;

28   https://truabutment.com/collections/cerec%C2%AE-scan-post-kits/products/cerec%C2%AE-ti-base;

1  deceive dental laboratories and dentists so that they will purchase TruAbutment

2  products at a discount from authentic Straumann components.

3          **3.     Straumann Is Likely To Succeed On the Merits of Its  Unfair**

4                 **Competition Claim**

5          "The purpose of the Unfair Practices Act is "to safeguard the public against

6  the creation or perpetuation of monopolies and to foster and encourage competition,

7  by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and

8  discriminatory practices by which fair and honest competition is destroyed or

9  prevented." (§ 17001.) It prohibits specific "practices which the legislature has

10  determined constitute unfair trade practices.'"  *Cel-Tech Commc'ns, Inc. v. Los*

11  *Angeles Cellular Tel. Co*., 20 Cal. 4th 163, 179 (1999) (citation omitted).

12          In order to state a claim for breach of Section 17200, "'a plaintiff must show

13  either an (1) 'unlawful, unfair, or fraudulent business act or practice,' or (2) 'unfair,

14  deceptive, untrue or misleading advertising.'"  *Moss v. Infinity Ins. Co.,* 197 F.

15  Supp. 3d 1191, 1198 (N.D. Cal. 2016) (citation omitted).  Accordingly, the Courts

16  have recognized that "to state a claim under Section 17200, a plaintiff must establish

17  that the practice is (1) unlawful (i.e., is forbidden by law), (2) unfair (i.e., harm to

18  victim outweighs any benefit) or (3) fraudulent (i.e., is likely to deceive members of

19  the public). A plaintiff only needs to establish a violation of the UCL under one of

20  these three prongs, as each operates independently from the others."  *Id.*

21          Further, "[b]y proscribing 'any unlawful' business practice, 'section 17200

22  "borrows" violations of other laws and treats them as unlawful practices' that the

23  unfair competition law makes independently actionable."  *Cel-Tech Commc'ns, Inc.*

24  *v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (citation omitted).

25  However, "[t]he statutory language referring to 'any unlawful, unfair *or* fraudulent'

26  practice (italics added) makes clear that a practice may be deemed unfair even if not

27  specifically proscribed by some other law. *Id.* (citation omitted).

28

1         Here, acts and practices by TruAbutment result in direct and indirect acts of

2   patent infringement and are likely to confuse, mislead or deceive the general public

3   as to the compatibility of its products with those of Straumann, as to the safety of its

4   products, and as to the extent of FDA approval of its products, and therefore

5   constitutes unfair and fraudulent business practices in violation of California

6   Business & Professions Code § 17200, *et seq*.

7         The above-described acts further constitute business acts that violate Sections

8   32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), and the Patent Act,

9   35 U.S.C. §§ 271(a) and (b), and are therefore unlawful.

10         TruAbutment's infringement of the '904 and the '802 patents and its false

11   advertising in violation of the Lanham Act each constitute an independent basis for

12   finding unfair competition.  Further, TruAbutment's failure to obtain 510(k)

13   clearance prior to selling the Accused Products constitutes an unfair practice in and

14   of itself sufficient to support a violation of California Business & Professions Code

15   § 17200.

16         **C.**    **Straumann Will Be Irreparably Harmed If Defendants Are**

17                   **Allowed To Continue Their Conduct**

18         The Court's "frequently reiterated standard requires plaintiffs seeking

19   preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an

20   injunction." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008).

21         "Evidence of threatened loss of prospective customers or goodwill certainly

22   supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales Co.*

23   *v. John D. Brush & Co.,* 240 F.3d 832, 841 (9th Cir. 2001).  Further, "where the

24   threat of injury is imminent and the measure of that injury defies calculation,

25   damages will not provide a remedy at law." *Gilder v. PGA Tour, Inc.,* 936 F.2d

26   417, 423 (9th Cir. 1991) (citation omitted).

27         To show irreparable harm in a patent infringement case, "a patentee must

28   establish . . . : 1) that absent an injunction, it will suffer irreparable harm, and 2) that

1    a sufficiently strong causal nexus relates the alleged harm to the alleged

2    infringement." *Apple Inc. v. Samsung Electronics Co*., 695 F.3d 1370, 1374 (Fed.

3    Cir. 2012).  "Price erosion, loss of goodwill, damages to reputation, and loss of

4    business opportunities are all valid grounds for finding irreparable harm." *Celsis In*

5    *Vitro, Inc. v. CellzDirect, Inc*., 664 F.3d 922, 930 (Fed. Cir. 2012).

6          Courts have also recognized that harm to the general public may form the

7    requisite irreparable harm in a private action.  *See, Rutter Group Prac. Guide Fed.*

8    *Civ. Pro. Before Trial* Ch. 13-C, Requirements for Injunctive Relief, *quoting*

9    *Mississippi Power & Light Co. v. United Gas Pipe Line Co.* (5th Cir. 1985) 760 F2d

10   618, 623 ("Under limited circumstances, a claim of irreparable harm in a private

11   action may be based on harm to the general public.").

12         Here, Straumann is exposed to ongoing and continuous harm to its market

13   share and good reputation based on TruAbutment's conduct.  When TruAbutment

14   encourages a dental lab to substitute its abutment and locking screw for use with a

15   Straumann implant, there is no meaningful way for practitioners to distinguish

16   between TruAbutment parts and authentic Straumann parts because there is typically

17   no unique branding on the abutment itself.  (Cochran Decl., ¶ 4.)  As a result, when

18   the inferior, knock-off TruAbutment components are used with a Straumann implant

19   and fail, the failure is inaccurately attributed to Straumann which causes dentists to

20   abandon the use of Straumann products altogether or Straumann's 2.9 mm implant

21   given the high failure rate of TruAbutment's 2.9 mm products.  (Cochran Decl. ¶ 9.)

22         The immediate fall-out from TruAbutment's infiltration of the market with

23   inferior, non-compatible, knock-off abutments has been to cause dentists to abandon

24   the use of Straumann's 2.9 mm implant in favor of more robust larger products.  *Id*.

25   Straumann's 2.9 mm implant is the result of years of development and an extensive

26   FDA approval process.  (Jackson Decl., ¶ 7).  TruAbutment, on the other hand, did

27   not seek FDA approval for its 2.9 mm abutment, which is a criminal violation, and

28   which exposes patients to serious medical risks.  (*Id.*at ¶¶ 11-12, Ex. A.)

1   TruAbutment's injection of its inferior knock-off abutments is destroying what

2   would otherwise be a robust market for Straumann's 2.9 mm implant. (Cochran

3   Decl., ¶ 9.)

4       **D.      The Balance Of Equities Tips In Favor Of Granting Preliminary**

5       **Injunctive Relief To Straumann**

6       The Courts have recognized that, in analyzing a request for injunctive relief,

7   they 'must balance the competing claims of injury and must consider the effect on

8   each party of the granting or withholding of the requested relief.'" *Winter v. Nat.*

9   *Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008) (citation omitted). *See, Disney*

10  *Enterprises, Inc. v. VidAngel, Inc.,* 869 F.3d 848, 866 (9th Cir. 2017)(citation

11  omitted) (citing *Winter* balancing requirement prior to entry of injunction.). "[T]he

12  essence of a patent right is the right to exclude others, immediate irreparable harm is

13  presumed upon a finding of validity and infringement." *A & L Tech. v. Resound*

14  *Corp.*, 1995 U.S. Dist. LEXIS 22442, *3 (N.D. Cal. March 15, 1995).

15      Here, dental implants are part of a significant medical procedure subject to

16  strict federal regulatory requirements to ensure that the medical devices used in

17  those procedures are safe and effective. Abutments used for dental implants are

18  classified as a Class II medical device by the FDA (Code of Federal Regulations 21

19  872.3630) which means that they are considered "medium to moderate risk devices"

20  by the FDA. (*Id.* at ¶ 5.) As a result, Section 510(k) of the Food, Drug and

21  Cosmetic Act requires a Premarket Notification or 510(k) to the FDA upon any

22  intent to market this type of medical device. (*Id*. at ¶ 6.) The process of obtaining

23  510(k) clearance is time consuming and expensive but for good reason because the

24  process allows for FDA regulation of the marketing of medical devices to ensure

25  that they are safe and effective. (*Id.* at ¶¶ 6-8.)

26      TruAbutment does not appear to have not sought 510(k) clearance for most of

27  the products it advertises as "compatible" with Straumann's implants, including

28  Straumann's 2.9 mm bone level tapered implants. (*Id.* at ¶¶ 10-12, Ex. A). The

FDA has been notified of TruAbutment's non-compliance with the 501(k) clearance requirement.  (*Id.* at ¶13, Ex. B). Straumann stands to lose sales and market share for its implants in general by confusion that TruAbutment's failed abutments are either Straumann products or compatible substitutes.  (Cochran Decl., ¶ 9.) However, the potential market abandonment of Straumann's entire 2.9 mm bone level tapered implant device line has a potentially devastating and unquantifiable impact on Straumann's operations.  Straumann is a leader in the market for premium dental implants, and the introduction of the 2.9mm implant was a game changer in the industry.  If dental labs and dentists wrongly attribute the failure of an implant surgery to Straumann as a result of the failure of what are actually TruAbutment components and abandon the use of Straumann's products, competition will infiltrate the market and Straumann will never be able to regain its primary market position and reputation.  (*Id.*)

On the contrary, there are no equities favoring a denial of the requested injunctive relief.  TruAbutment is marketing a knock-off product that infringes Straumann's patents and does not have proper FDA clearance.  (Jackson Decl., ¶¶ 10-12.)  Therefore, TruAbutment's sales are improper and any stay in those sales does not justify denial of an injunction.  *See Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (citation omitted) ("lost profits from an activity which has been shown likely to be infringing ... merit[ ] little equitable consideration.").

**E.    Granting Preliminary Injunctive Relief Is In the Public Interest**

"The public interest inquiry primarily addresses impact on non-parties rather than parties."  *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014)(citation omitted).  *See, Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 867 (9th Cir. 2017)(citation omitted) ("The court must 'pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'"); *All for the Wild Rockies v.*

1   *Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) ("The public interest analysis for the

2   issuance of a preliminary injunction requires us to consider whether there exists

3   some critical public interest that would be injured by the grant of preliminary

4   relief.").  Further, the widespread harm and cost to the public from failed implants

5   has been the subject of class action litigation.  *See e.g., Yamada v. Nobel Biocare*

6   *Holding AG,* 825 F.3d 536, 540–41 (9th Cir. 2016) ("Projected classwide damages

7   were estimated at $450 million and were calculated as follows: $8 million for the

8   price of the 20,000 failed implants, representing an estimated 20% failure rate out of

9   100,000 total implants at $400 per implant; $70–100 million for the surgical

10  replacement of the 20,000 implants at $3,500 per procedure; $60 million to repair or

11  restore teeth adjacent to the implant; and $325 million for monitoring and medical

12  costs.")

13          Here, TruAbutment's products have experienced an unacceptably high failure

14  rate as evidenced by repeated reports from doctors and dental laboratories.

15  (Cochran Decl., ¶¶ 4-8.)  TruAbutment's poorly manufactured abutments present

16  serious safety risks to patients because it is not manufactured to the exact

17  specifications of the original product, and/or because it is made of inferior materials

18  thereby increasing the risk that the implant, abutment, or screw, or some

19  combination thereof, will break.  (Vogel Decl., ¶¶4-9).  When breakage occurs,

20  patients are subjected to emergency surgery to remove and replace the failed

21  component.  (*Id*. at ¶10.)  The most common approach for implant removal has been

22  trephination, which involves using a drill bit wider than the implant and removing

23  the whole assembly (while trying to avoid removing or damaging as much other

24  surrounding and bone as possible).  Trephination carries serious risks of permanent

25  damage to the patient's bone, tissue, nerves, and other oral structures.  (*Id*. at ¶11-

26  12.)  Another option for removing a broken dental implant involves trying to place a

27  new screw inside the implant with a reversed thread, and then removing the implant

28  and screw together under considerable force.  While this can minimize damage to

surrounding tissue, this procedure involves substantial torque, which can cause the screw to break, requiring another, more invasive approach.  (*Id.* at ¶13.)  Other approaches to implant removal involving thermal explantation and application of piezoelectric charge have been proposed but not widely accepted.  (*Id.* at¶14.)  The public interest is served by eliminating these inferior products which, as noted above do not even have 510(k) clearance from the FDA, from the marketplace because it promotes patient safety and welfare.

## IV.    CONCLUSION

For the foregoing reasons, Straumann respectfully requests that this Court issue a temporary restraining order and Order to Show Cause Re: Preliminary Injunction that enjoins and restrains defendants as set forth in detail in the Notice of this Application and in the Proposed Temporary Restraining Order to Show Cause served concurrently herewith.

DATED:  May 9, 2019           **EASTMAN MCCARTNEY DALLMANN LLP**

By:           /s/ Andrew S. Dallmann
                 Andrew S. Dallmann
                 Attorneys for Plaintiffs
                 Straumann USA, LLC

## **CERTIFICATE OF SERVICE**

I certify that on May 9, 2019, I electronically filed the foregoing PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE TO ENJOIN AND RESTRAIN DEFENDANTS FROM 1) INFRINGEMENT OF U.S. PATENT NO. 8,408,904, 2) INFRINGEMENT OF US. PATENT NO. 8,968,002, 3) FALSE ADVERTISING (Lanham Act §43); 4) UNFAIR BUSINESS PRACTICES (Cal. Bus. & Prof. Code §17200, *et seq.*) with the Clerk of the Court for the United States District Court, Central District of California, by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Executed on May 9, 2019, at Irvine, California.

/s/    *Andrew S. Dallmann*